Morris Leftwich

*v.*

Wesco Corporation, *A Corporation*
and John M. Murray

(No. 12067)

Submitted January 24, 1961.    Decided March 14, 1961.

198

Browning, Judge, dissenting

*Palmer & Elkins, J. Campbell Palmer, III.*, for plaintiff in error.

*Rudolph L. DiTrapano*, for defendant in error.

Berry, Judge:

This case involves an automobile accident which occurred on January 17, 1958, near the Town of Decota in Cabin Creek District, Kanawha County, West Virginia. An action was instituted by the plaintiff, Morris Leftwich, against the defendants, Wesco Corporation, a Corporation, and John M. Murray, in the Court of Common Pleas of Kanawha County, West Virginia, was tried in said Court on October 7, 8, 9, 1958, and resulted in a jury verdict in the amount of $10,000.00 for the plaintiff. The trial court entered judgment on

the verdict on February 8, 1960. The defendants applied to the Circuit Court of Kanawha County for a writ of error, which was refused on June 2, 1960. Upon application to this Court, a writ of error and supersedeas was granted on August 5, 1960.

The plaintiff, at the time of the accident, was manager of the Kanawha-Boone Service Station, which is located near the Carbon Fuel Company in Cabin Creek District in Kanawha County, and owned by the stockholders of that Company. On the day of the accident it had been snowing and the roads were covered with snow and ice. The plaintiff's automobile, a 1955 Plymouth, had been parked at the service station where he worked and when he ceased work at 5 o'clock p.m. on the day of the accident he got into his car, which was equipped with chains, and started to drive to his home at Decota. Homer Jarrell, Jr. was a passenger in his car at this time. The plaintiff had been driving his vehicle about 25 or 30 miles per hour when he approached a driveway leading to his home, at which time he reduced his speed to about half his former speed, driving on his right side of the road or highway. When he was within a short distance of his home the speed of his car was reduced further, as he intended to turn into the driveway leading to his home.

The defendant, Murray, was driving a 1956 Ford Station Wagon, equipped with snow tires, and was following plaintiff's vehicle. Murray had passed another vehicle traveling in the same direction as both he and the plaintiff prior to the accident. According to the testimony of the driver of the car which was passed by Murray, he, Murray, was driving somewhere around 45 miles per hour when he passed him. The defendant, however, testified that he passed him at a speed of about 25 miles per hour. After Murray passed this vehicle he drove back to the right side of the road for some distance, then turned out to the left of the road again, sounded his horn, and attempted to pass the plaintiff's car which was traveling in a northerly direction, but, upon observing another car approaching

in a southerly direction, turned back to the right, being at this time some two or three car lengths behind plaintiff's vehicle. The plaintiff testified that he did not hear defendant sound the horn on his car. The highway at the place of the accident is a two lane highway, about sixteen feet in width, and the passing lane, was, of course, the driving lane for traffic moving in the opposite direction. When the defendant, Murray, turned his station wagon back to the right of the road in order to avoid a collision with the approaching vehicle, he was, by necessity, driving at a faster rate of speed than that of the plaintiff, which, according to his testimony, was about 25 miles per hour. The plaintiff was, at the same time, reducing his speed, having reduced it to about 10 or 15 miles per hour in approaching the driveway leading to his home, and at the time of the accident had reduced his speed to about 5 or 10 miles per hour. The defendant, Murray, applied his brakes in order to reduce his speed, upon observing plaintiff reducing his speed, and his station wagon skidded on the highway, which was covered with snow and ice, and ran into the right rear of plaintiff's vehicle, pushing the plaintiff's car about one car length forward, throwing plaintiff's hat to the floor of the car and jerking him back in his seat. The vehicle approaching from the opposite direction had passed the plaintiff's automobile before the accident occurred. The defendant, Murray, testified that he saw the brake lights appear on plaintiff's car, but did not see any signal lights which would indicate any intention of plaintiff to make a turn. The plaintiff and his passenger, Jarrell, stated that the turning signal light was on before the accident occurred. Although there is a conflict in the evidence as to whether the plaintiff had reduced his speed to about 5 miles per hour, or, as he claimed, 10 or 15 miles per hour when the accident occurred, Murray testified that the speed of plaintiff's car was reduced gradually. However, there is no conflict in the evidence that the plaintiff was unaware that there was any vehicle following him

at the time he reduced his speed, and that he did not attempt to ascertain if anyone was behind him.

Following the accident, the plaintiff got out of his car and indicated that he was not hurt, although he was jerked back in his seat and his hat thrown to the rear of his car as a result of the impact. Later that night he decided that his neck was injured, and visited a doctor the next morning. He later went to a hospital where he was examined by a specialist, remaining in the hospital for nine days. He was placed in traction and required to use a "Thomas Collar" which held his head erect. He continued to visit his doctor at intervals for a period of several months, and claimed continuous suffering from the injury at the time of the trial. He contended that he could not perform his duties at the filling station as well as he had before the accident. Witnesses, however, testified that he was doing the same work, making the same wages as before the accident and that, in fact, he had lost no pay as a result of the accident, as his pay continued during his stay in the hospital.

The plaintiff alleges in his original declaration that he had lost his position as a result of the accident. When the proof failed to sustain this allegation, plaintiff's attorney moved the court for leave to amend his declaration and eliminate this matter, which motion was granted by the court during the trial of the case. However, the amended declaration was not filed until December 8, 1959, fourteen months after the verdict was returned by the jury, but it was filed two months before the trial court entered judgment on the verdict, which was on February 8, 1960.

During the course of the trial the plaintiff attempted to prove an item of special damage involving some property consisting of two old buildings or houses which, he claimed, he intended to repair, making them into one which he could rent, but, by virtue of the injury received, he had been unable to do the work himself and was forced to employ some other person to do the

work for him. He stated that he gave one lot to the man for doing the work which, upon completion, resulted in his being able to rent the property for one month at $35.00. In attempting to fix the value of the lot he gave the carpenter who performed the work, he stated that he did not know the amount paid for the property when he purchased it; that he did not know the value of the portion of the property given to the man as compensation for his work on the houses; but testified that he believed it to be worth $800.00 or $1000.00. The attorney for the defendants objected to this testimony, which was overruled by the trial court. The plaintiff offered no instruction to the jury with regard to this item of damage.

When the defendants' attorney was cross-examining the witness, Jarrell, he apparently had a written statement given by the witness in his hand, but the written statement was not being used at a time when the attorney for the plaintiff interrupted the cross-examination, without making any formal objection, and addressed the court in the presence of the jury, in the following language: "Your Honor, Mr. Palmer sent an attorney or some agent up to talk to this man and he made a statement to him and he has the statement here in his hand and to impeach the witness he should ask him the proper questions and he should ask him what statement was made and should read his statement to him because it isn't fair to come in here and introduce the statement here after he had questioned him. I understand he is trying to impeach the man."

After this statement was made by the attorney for the plaintiff, the court merely directed the attorney for the defendants to proceed with his cross-examination, stating that if there was an attempt made to use the statement, and there was any objection, it would be taken care of later.

Counsel for the defendants then moved that the remarks made by counsel for the plaintiff be stricken from the record, since there was no occasion for them, at

which time the court directed the defendants' attorney to get along with the cross-examination, which was done in a regular manner without using or referring to the statement. However, when a question was propounded the witness by the defendants' attorney as to whether or not he had told an employee of his that the roads were icy and slick at the time of the accident, the attorney for the plaintiff, without making a formal objection, or addressing his remarks to the court, made the following statement: "This is impeachment and I think he should ask the witness whether or not he wrote this down and let me see this (indicating)." An argument ensued between counsel when the attorney for the defendants refused to permit counsel for the plaintiff to see the paper. The attorney for the plaintiff apparently was endeavoring to have the defendants' attorney use the statement in cross-examination of the witness, because he stated that he thought counsel for the defendants should ask the witness if the statement was not made on a certain date, and that he wanted to see the statement, at which time the court again directed the attorney for the defendants to proceed with his questioning. Although the statement was never introduced into evidence and the witness was not impeached, the attorney for the plaintiff continued to make statements before the court and the jury that he thought when a statement was introduced into evidence and an attempt made to impeach a witness, the witness should be given an opportunity to examine the statement to ascertain if it was the statement which he had signed.

Notwithstanding the facts that the statement had never been introduced into evidence, had not been used in cross-examination up until this time, and the witness had not been impeached by the questions propounded to him, the first question asked by the attorney for the plaintiff on redirect examination was as follows: "Homer, do you know who this man was you made the statement to? Do you know who he was?", to which question the witness replied as follows: "He was the

insurance man. I don't know what he does, probably an investigator." Six questions later, all dealing with the statement, the following question was propounded to the witness, when he was asked: "How long after this accident did this happen, the questioning that is?", and the witness answered: "About eight months before the insurance man came to me asking me the questions." Four more questions dealing with this statement which had never been introduced into evidence were asked on redirect examination, and four on re-cross-examination. At this time the attorney for the defendants requested the court to be heard in chambers, and moved for a mistrial because of the fact that the question of insurance had been injected into the case by the plaintiff's attorney. This motion was overruled by the court at a later time during the trial, at which time the court, over the objection of counsel for the defendants, instructed the jury as follows: "Ladies and gentlemen of the jury, during the course of this trial there have been certain remarks of counsel, certain remarks of counsel for the plaintiff and you are now instructed to disregard them and of course you have been told what the issue is in this case and you will of course consider the testimony that comes from the witness stand and many remarks of counsel are sometimes made in the heat of a trial and you should disregard them. Now, you are also instructed that insurance has no place in this case and you will decide the case on the basis of the issue presented to you and the remark of the witness, Homer Jarrell, with respect to the reference to insurance, you will disregard and give no effect whatsoever and determine the issue presented in this case on the testimony that is presented to you and the instructions of the Court and any reference to insurance by the witness you will completely and fully disregard."

Three days were consumed in the trial of this case before a jury in the trial court. The record indicates that during the trial continuous bickering existed between counsel for the plaintiff and counsel for the

defendants. Both counsel repeatedly, during the trial, without making formal objections to the court, made lengthy statements before the jury relating to personalities of counsel and many other matters which should not have been done. On one occasion, a reference was made by one counsel to unethical experiences had with the other counsel. On several occasions the trial court had to call counsel back into chambers to discuss matters. These statements and colloquies between counsel were improper, caused delay in the trial, and should not have been made. The proper and orderly conduct of a trial in the nature of the case at bar was for counsel to merely address the court and to object to any conduct of the trial by the opposing counsel which he did not consider proper, without making any statements before the jury, or giving any reasons for the objection, unless the reason for the objection is requested by the court, or counsel states to the court he desires to give his reason and argue the merits of the objection, which then could be done out of the hearing of the jury, if the situation warrants such action. Because of the conduct of counsel for both the plaintiff and defendants during the trial of this case, both in the examination of witnesses and in the closing arguments to the jury, the trial court would have been justified in declaring a mistrial. In this connection, in order to clearly indicate such impropriety of counsel, we quote from Canon 17, Code of Professional Ethics, 128 W. Va. xxvi: "All personalities between counsel should be scrupulously avoided. In the trial of a cause it is indecent to allude to the personal history or the personal peculiarities and idiosyncrasies of counsel on the other side. Personal colloquies between council which cause delay and promote unseemly wrangling should also be carefully avoided."

Many assignments of error have been made in this case. When the motion to set aside the verdict in the trial court was made, the defendants' counsel assigned twenty-three grounds. The defendants' brief, filed in this court, assigns about fifteen grounds. Many of the

assignments deal with improper conduct and actions on the part of the plaintiff's counsel and passion and prejudice alleged to have been injected into the case. On the other hand, the attorney for the plaintiff asserts in his brief that the attorney for the defendants was guilty of improper statements and conduct in the trial of the case. This does not excuse or make proper the actions or conduct of either the attorney for the plaintiff or the attorney for the defendants in this case. Nevertheless, the remarks of counsel for both plaintiff and defendants were, no doubt, provoked by the remarks of the other, and in such cases, the verdict will not ordinarily be set aside. 88 C.J.S., Trial, §194; *Brann v. F. W. Woolworth Co.*, 181 Va. 213, 24 S.E. 2d 424; *Diamond Cab Co. v. Jones*, 162 Va. 412, 174 S.E. 675.

However, during the closing argument by counsel for the plaintiff, he said that if the plaintiff lost his job at the service station, he knew, and the jury knew, industry would not hire a man who had received and suffered the same kind of an injury as that of the plaintiff. There was no evidence to support such a statement in the trial of this case and an objection was made by counsel for the defendants on this ground, which was admitted to be true by the court, although it stated that counsel had the right to comment on such statement. If the matter was not in evidence, counsel had no right to comment on it, and the court should have so instructed the jury and told them not to consider such statement. *Taylor v. Mallory*, 96 Va. 18, 30 S.E. 472; *Virginia Electric & Power Co. v. Decatur*, 173 Va. 153, 3 S.E. 2d 172; *Scales v. Majestic Steam Laundry*, 114 W. Va. 355, 359, 171 S.E. 899; *Elswick v. Charleston Transit Co.*, 128 W. Va. 241, 36 S. E. 2d 419. Although no specific assignment of error as to this matter was made in this court, a general motion for a mistrial was made at the conclusion of the argument of counsel for the plaintiff, because of the remarks made during the closing argument. See *State v. Friedman*, 124 W. Va. 4, 18 S.E. 2d 653.

Counsel for the defendants also complains and assigns as error the argument to the jury by counsel for the plaintiff that defendants had money to spend on professional witnesses, and money to hire them to come in and testify during the trial, but that they could not find one to testify for the defendant. It is true that council for the plaintiff should not have argued that the defendants had plenty of money with which to hire witnesses, but the court instructed the jury to disregard this statement. What he actually said later in his argument about not finding a witness to testify was that one could not be found to say that plaintiff was not hurt in the accident. No objection was made to the latter statement, that they could not find a doctor to testify that plaintiff was not hurt, until the completion of the argument, at which time the attorney for the defendants made the general motion for a mistrial because of the remarks made by counsel for plaintiff in his closing argument.

These assignments of error relating to the conduct and statements of counsel, which took place during the trial and closing argument of counsel, are quite numerous, and will not be discussed further in this opinion. Although they are not in any manner approved, we do not hold that they constitute reversible error in this case for the reasons and authorities cited above. However, it is hoped that such conduct will be corrected in the future by the parties involved and will not be repeated in the trial of any case.

Another assignment of error alleges the trial court erred in refusing to exclude the testimony of a witness to the effect that the defendant had been driving at a speed of about 45 miles per hour before the accident occurred. The reasons for the assignment are that Murray was a considerable distance away from the point of the accident, and that the testimony is uncontradicted that he was not exceeding the speed of 25 or 30 miles per hour at any time. In the first place, this record contains nothing to indicate that the estimate of defendant, Murray's, speed was made at a time

when he was a considerable distance from the point of the accident. The witness who gave the testimony stated that he estimated the speed of Murray's car at the time Murray passed his automobile and this witness saw the accident occur. The defendant, Murray, testified that he was only going 25 to 30 miles per hour before the accident occurred, but to say that this testimony was uncontradicted entirely ignores the testimony of the witness regarding the speed of Murray's car at the time it passed him. Ordinarily, witnesses who are familiar with automobiles and operate them may express opinions as to speed, and no error was committed in this instance when the court refused to exclude this testimony. 7 M.J., Evidence, §191; *State v. Statler*, 86 W. Va. 425, 103 S.E. 345.

Another assignment of error is directed to the trial court's allowing the plaintiff to testify with regard to the value of a parcel of real estate which he gave to a carpenter for doing some work for him. It is true that the plaintiff indicated that he did not know the amount he paid for the real estate in question, and that this evidence is questionable. However, anyone having special knowledge of real estate, such as the owner who may have some peculiar qualification or more knowledge than jurors are ordinarily supposed to possess, can generally express an opinion as to its value. 7 M.J., Evidence, §192; *Brown v. Crozer Coal & Land Company*, 144 W. Va. 296, 107 S.E. 2d 777. Apparently, the plaintiff's attorney was of the opinion that this evidence was questionable, because he offered no instruction with regard to this element of damage, and indicates in his brief that it was not relied on. However, if it was not sufficient to be relied on, it should not have been offered.

Error is also assigned because plaintiff's doctors were permitted to testify generally as to injuries to muscles in similar injuries to those which plaintiff sustained, without connecting such testimony to the plaintiff's injuries. A wide latitude as to expert medical testimony is allowed, and, although it should be

confined to the injuries in question, such witnesses can give their opinion with regard to the nature of the injury, whether it is permanent or temporary, and the probable result based on medical knowledge and experience with regard to such injuries. It has been held that the fact that a medical expert is permitted to express an opinion upon a matter based on common knowledge may be harmless error. 7 M.J., Evidence, §172; *Barker v. Ohio River Railroad Company*, 51 W. Va. 423, 41 S.E. 148. Therefore, the testimony of the expert medical witnesses in this case did not constitute reversible error.

It is contended by the defendants that it was error to permit the declaration to be amended "thirteen" months after the jury verdict, and after defendants' motion in arrest of judgment, and in refusing to allow a written demurrer to be filed to the amended declaration.

The original declaration alleged that the plaintiff lost his position as manager of the Kanawha-Boone Service Station as a result of the injuries received in this accident. This allegation was not supported by proof, and during one of the arguments had in the course of the trial, counsel for the plaintiff moved the court for leave to amend his declaration in order to strike out that portion of the declaration. This motion to amend the declaration was made on October 8, 1958, and although various motions were made and orders entered, the declaration was not amended until December 8, 1959, fourteen months after the verdict of the jury was returned, at which time an amended declaration was filed. Although Code, 56-4-24, provides that the court may permit the plaintiff to amend his declaration at any time before final judgment if it is of the opinion that substantial justice will be promoted, it has been held that the amendement should be made under this section within a reasonable time and pursued with reasonable diligence. *R. D. Johnson Milling Co. v. Read et als.*, 76 W. Va. 557, 85 S.E. 726. Code, 56-4-27, provides that if there appears to be a variance

between the allegation and the proof, and if the court, in its opinion, believes that substantial justice will be promoted, it may allow pleadings to be admended to conform with the proof. In construing the meaning of Code, 56-4-24, and Code, 56-4-27, this Court, in the case of *Sammons Bros. Construction Company v. Elk Creek Coal Company,* 135 W. Va. 656, 65 S.E. 2d 94, held that these sections should be read *in pari materia* and liberally construed and further held that it was not error for the trial court to permit the plaintiff to amend his declaration, though the jury had returned its verdict but judgment had not been entered thereon. It would appear that the assertion in the assignment of error which states that the demurrer was not filed is not technically correct, because it is contained in the record in this case, but was not ruled upon by the court. The action of the court in not ruling on the demurrer was proper, because the contents of the written demurrer indicated that it was not a demurrer, but a motion such as was disposed of in the motion for a directed verdict and motion in arrest of judgment. A demurrer admits all facts well pleaded, but contends they are not sufficient in law and assigns reasons therefor. The contention of the demurrer merely cites that the defendant moved to amend the declaration during the trial, that no amended declaration was filed, that the defendants moved for a directed verdict on the grounds that there was no declaration in the case, that after the verdict was returned the defendants made a motion in arrest of judgment because the jury had returned a verdict and there was no declaration in existence; that the declaration was barred by laches because there was unnecessary delay in filing same, all of which had been previously overruled by the court.

In the first place it was not necessary to amend the original declaration, because even though the allegation was not proved, it would be mere surplusage, and would not affect the pleading or outcome of the case. Then too, even if the original declaration was superseded by the amended declaration when it was filed

fourteen months later, before the entry of the judgment on the verdict, the original declaration remained in the case and was a foundation for the amended declaration and there was always a declaration in existence. 71 C.J.S., Pleading, §321 (c); *Greenville Commun. H. Corp. v. Alexander Smith, Inc.,* (S.C.) 95 S.E. 2d 262.

Other assignments of error by the defendants relate to the refusal of the court to give certain instructions offered by the defendants relative to contributory negligence on the part of the plaintiff, and the skidding of the automobile driven by the defendant, Murray. These assignments of error are general and do not specify the certain instructions, but refer to all the instructions dealing with these matters. Contributory negligence on the part of the plaintiff is an affirmative defense. There is a presumption of ordinary care in favor of the plaintiff, and where the defendant relies upon contributory negligence, the burden of proof rests upon the defendant to show such negligence unless it is disclosed by the plaintiff's evidence or may be fairly inferred by all of the evidence and circumstances surrounding the case. 13 M.J., Negligence, §56; *Ewing v. Lanark Fuel Company,* 65 W. Va. 726, 65 S.E. 200; *Melton v. Chesapeake & Ohio Railway Co.,* 71 W. Va. 701, 78 S.E. 369; *Mullens v. Virginian Railway Co.,* 94 W. Va. 601, 119 S.E. 852; *State ex rel. Myles v. American Surety Co.,* 99 W. Va. 123, 127 S.E. 919.

When a vehicle is following another on a public road or highway, the duties of the driver of each vehicle are reciprocal and governed by the circumstances of the particular situation. The operator of the vehicle ahead must exercise ordinary care in order to prevent an accident with the vehicle which may be following him by giving the necessary signals by the use of proper warning lights or signals to the overtaking traffic. Some courts, however, have held that the vehicle ahead has the superior right, and that the driver of such vehicle ordinarily owes no duty to the

following vehicle except to use the road or highway in the usual manner and to conform with the motor vehicle laws applicable thereto. The vehicle in front cannot entirely ignore the vehicle in the rear, but should keep a lookout where signals are given by the vehicle in the rear that would indicate some maneuver to be made by it. 60 C.J.S., Motor Vehicles, §§ 321, 322; *Stallard v. Atlantic Greyhound Lines,* 169 Va. 223, 192 S.E. 800; *Luck v. Rice,* 182 Va. 373, 29 S.E. 2d 238.

It is true that where a motorist intends to stop or suddenly reduces his speed, he must use ordinary care for his own safety and for the safety of others in vehicles following closely behind him. 60 C.J.S., Motor Vehicles, §301; *Stallard v. Atlantic Greyhound Lines, supra; Luck v. Rice, supra.* However, in the case at bar, the evidence of the defendant, Murray, is uncontradicted that the plaintiff gradually reduced the speed of his vehicle and did not stop suddenly. The record indicates that his speed was reduced from approximately 25 or 30 miles per hour to about half that speed, and, perhaps 5 miles per hour, over a considerable distance on the highway before the accident occurred. Both the plaintiff and defendant were charged with the knowledge that the road upon which they were traveling was slick as a result of snow and ice. The general law in this state regarding the control of a vehicle being operated on a highway provides that in every event speed should be so controlled as may be necessary in order to prevent colliding with any person, vehicle or other conveyance on the highway and requires all persons to use due care. Code, 17C-6-1.

The plaintiff testified that he intended to turn off the highway into a driveway leading to his home. There is a conflict in the evidence as to whether he gave a proper signal of his intention to turn. The plaintiff and the passenger in his car stated that the proper signal was given, although the defendant, Murray, testified that he did not see such signal. Code, 17C-8-8 (b), provides: "A signal of intention to turn right or left when required shall be given continuously

during not less than the last one hundred feet traveled by the vehicle before turning." The defendant, Murray, did say he saw the stop light appear on plaintiff's vehicle when he applied his brakes in reducing his speed. There is also a conflict in the evidence as to whether or not the defendant sounded his horn when he attempted to pass the plaintiff's vehicle, before turning back to the right of the road behind plaintiff's car after he observed the automobile approaching from the opposite direction. Murray stated that he sounded his horn; the plaintiff testified that he did not hear it. The plaintiff was not required to ascertain whether the defendant's vehicle was following him unless he was aware of it by some signal or otherwise. 60 C.J.S., Motor Vehicles, §322.

The attorney for the defendants argued on several occasions that the rear window of plaintiff's automobile was covered with snow. There is no evidence in the record to support this contention. The plaintiff stated he entered his car at the place of his employment about 5 o'clock p.m. and started home. He further testified that it had been snowing on that day. The plaintiff's vehicle may have been parked inside the station, or if parked outside, the window may have been cleared of the snow before plaintiff started driving his vehicle home. But, even if this improper assumption were true, it would make no difference in this case because the plaintiff stated he did not know the defendant was following him and did not attempt to ascertain if anyone was behind him. However, if there had been a signal given to indicate that someone was following him and attempting to pass, it would have put him on notice that someone was behind him and he then may have been charged with some duty to ascertain what the situation was, considering the then existing conditions, in order to act with due care under the circumstances. Then too, if he intended to turn off the highway and did not follow the proper procedure, as required by law, in connection with this maneuver, which may have in any manner proximately

contributed to the accident, the question of negligence in connection with this issue should have been submitted to a jury for its determination. It may be that the questions involving conflicting evidence in this case should be submitted to the jury for its determination as to whether or not, if they believed that a signal had been sounded by the defendant, Murray, indicating that he was driving behind the plaintiff and intended to pass, and believed that a turning signal had not been given by the plaintiff indicating his intention to make a turn for a distance of 100 feet before the point at which the turn was to have been made, these facts proximately contributed in any manner to the accident. *Prettyman v. Hopkins Motor Co.,* 139 W. Va. 711, 81 S.E.2d 79; *Spurlin v. Nardo,* 145 W. Va. 408, 114 S.E. 2d 913.

Any instruction to the jury relating to any duty on the part of the plaintiff which he failed to perform, and which would in any way be considered contributory negligence, should be limited to these specific matters in determining whether or not the plaintiff acted as an ordinarily prudent person under the existing conditions in the case at bar. In so ruling, we do not hold that all the instructions offered by the defendants on contributory negligence were proper under the facts in this case, although they may contain proper statements regarding contributory negligence applicable to other cases where the facts warrant them.

Another assignment of error in this general category, with regard to instructions, is the refusal of the court to give a proper instruction pertaining to the skidding of the automobile on a slick road or highway to the effect that it is not proof of negligence. It is true that the law in this state is that the mere fact an automobile skids on a road or highway is not evidence of negligence. *Woodley v. Steiner,* 112 W. Va. 356, 164 S. E. 294; *Schade v. Smith,* 117 W. Va. 703, 188 S. E. 114; *Sigmon v. Mundy,* 125 W. Va. 591, 25 S. E. 2d 636. However, the driver of the vehicle must exercise unusual care so as to keep his automobile under control

on a road or highway covered with snow or ice, in order to avoid an accident by skidding. 2 M.J., Automobiles, §16; *Woodley v. Steiner, supra; Sigmon v. Mundy, supra.*

It was held in the *Woodley* case that although the mere fact an automobile skids on a road is not evidence of negligence where a road is slick due to the fact that it is covered with snow or ice, if the driver of an automobile attempts, without the exercise of due care, to pass another vehicle, under such circumstances, and in so doing his car skids, becomes unmanageable and collides with another vehicle, such driver of the motor vehicle may be guilty of negligence. An instruction dealing with skidding to the effect that it in itself is not evidence of negligence should include sufficient facts as indicated above, in order to conform to the law applicable to such principle so that the jury may consider whether or not the driver of the motor vehicle has used due care under the circumstances. 2 M.J., Automobiles, §16; *Woodley v. Steiner, supra; Schade v. Smith, supra; Sigmon v. Mundy, supra.*

It should be pointed out that the assignment of errors with regard to the instructions dealing with contributory negligence and skidding does not specify any particular instruction, but combined all the instructions dealing with this matter in the assignment and discussions in the briefs of defendants below and plaintiffs in error in this Court. See *State v. Friedman,* 124 W. Va. 4, 18 S. E. 2d 653. Under the facts and circumstances, as presented in the appeal of this case, the instructions given and refused by the trial court would not constitute reversible error.

Another assignment of error is that the verdict of the jury is excessive because it amounted to an award of more than one thousand dollars for each day plaintiff missed from his work. This reasoning, of course, did not take into consideration the duration and effects of the injury nor the question of whether or not the injury was permanent or temporary. Regardless of

whether or not the verdict was excessive, we express no opinion in this connection, because the evidence may be different in another trial. *Cook v. Railway Co.,* 97 W. Va. 420, 428, 125 S. E. 106.

The last assignment of error to be discussed is the assignment of error relative to the jury being apprised of the defendants' being protected by liability insurance. It is specifically assigned and properly presented in this Court.

The general rule in this state with regard to this matter is that insurance should not in any manner be brought to the attention of the jury and ordinarily will constitute reversible error, regardless of the instruction of the trial court to the jury not to consider insurance in arriving at its verdict. *Walters v. Appalachian Power Co.,* 75 W. Va. 676, 84 S. E. 617; *F. R. Christie, Adm'r v. Oscar Mitchell,* 93 W. Va. 200, 116 S. E. 715; *Moorefield v. Lewis,* 96 W. Va. 112, 123 S. E. 564; *Wilkins v. Schwartz,* 101 W. Va. 337, 132 S. E. 887; *Fleming v. Hartrick,* 105 W. Va. 135, 141 S. E. 628; *Lynch v. Alderton,* 124 W. Va. 446, 20 S. E. 2d 657; *Bradfield v. Board of Education,* 128 W. Va. 228, 36 S. E. 2d 512; *Flanagan v. Mott,* 145 W. Va. 220, 114 S. E. 2d 331.

Certain exceptions have been made to this general rule, such as where the matters are induced by actions of the defendant or his counsel and not by any acts of the plaintiff or his counsel, or in cases where a reference to insurance is brought out for the purpose of showing bias on the part of a witness, or where the mention of insurance refers to other than liability or indemnity insurance. *Covington v. Navarre,* 99 W. Va. 431, 129 S. E. 313; *Ambrose v. Young,* 100 W. Va. 452, 130 S. E. 810; *Butcher v. Stull,* 140 W. Va. 31, 82 S. E. 2d 278; *Walker v. Robertson,* 141 W. Va. 563, 91 S. E. 2d 468; *Adkins v. Smith,* 142 W. Va. 772, 98 S. E. 2d 712.

In the case of *Covington v. Navarre, supra,* a written statement was used by the defendant's attorney in

cross-examination of a witness for the plaintiff; the statement was presented to the witness and used in the cross-examination for impeachment purposes, to contradict the witness during the cross-examination. It was held in that case that it was not error for a reference of liability insurance to be brought out in redirect examination when the court immediately instructed the jury to ignore such statement. It is to be noted in the Covington case that the defendant's attorney used and presented the written statement to the witness in order to contradict his testimony given on direct examination. In the case at bar the defendants' attorney did not present the written statement to the witness in cross-examination and the witness was not contradicted or impeached in any manner by the use of the written statement or otherwise. However, during the cross-examination, the attorney for the plaintiff called the attention of the jury to a written statement which had not been used during the cross-examination and stated to the court, in the presence of the jury, that the defendants' attorney had sent some agent to talk to the witness, that the witness made a statement to him, that he had the statement in his hand to impeach the witness, that he should ask proper questions, use the statement and read the statement to the witness, and introduce the statement into evidence after he had questioned him. After these remarks were made before the jury, the attorney for the defendants, without using the statement, attempted to ask the witness if he had made certain statements to an employee of his who had investigated the case, and was interrupted by the attorney for the plaintiff who stated that defendants' counsel was using a statement with regard to the impeachment of the witness, and that defendants' counsel should ask the witness whether or not anything was written down and plaintiff's counsel requested permission to see the statement.

The very first statement on redirect examination by plaintiff's attorney propounded to the witness was if he knew the name of the man who took the statement,

and the answer was that it was the insurance man and was probably an investigator. Six questions later he asked the same witness how long it was after the accident occurred that the witness was questioned in connection with the written statement, and the witness answered that it was about eight months before the insurance man came up to him asking the questions. No objection was made to the questions and answers at that time, but, after four more questions were propounded on redirect examination, a discussion held with regard to the statement before the jury, and four more questions asked on recross-examination, the attorney for the defendants requested the court to be heard in chambers, at which time a motion for a mistrial was made, because of the introduction into the case of a reference to liability insurance on the part of the plaintiff. The court, at the time, reserved ruling on the motion, the next day overruled the motion, and, over objection of the attorney for the defendants, instructed the jury not to consider the reference made to insurance in the case. The instruction to the jury mentioned insurance three times and thereby clearly impressed upon the minds of the jury that insurance was involved in the case, although the court instructed the jury to completely disregard the reference to insurance.

The manner in which the jury was apprised of the fact that defendants carried indemnity insurance, under the facts and circumstances in this case, constitutes reversible error, and the instruction to the jury by the court not to consider insurance does not cure the error. In fact, it may have impressed the matter upon the minds of the jurors. *F. R. Christie, Adm'r. v. Oscar Mitchell, supra; Adams v. Cline Ice Cream Co.,* 101 W. Va. 35, 131 S. E. 867; *Wilkins v. Schwartz, supra; Bradfield v. Board of Education, supra; Flanagan v. Mott, supra.*

It is contended by counsel for the plaintiff that because no objection to this matter was made at the time the jury was apprised of insurance coverage, the

matter was waived and could not be considered on this appeal, even though a motion for mistrial was made soon thereafter. This point is not well taken.

It was held in the case of *Yuncke v. Welker,* 128 W. Va. 299, 311, 36 S. E. 2d 410, that a proper objection in matters of this kind can be made by a motion for a mistrial, and if prejudicial remarks were made they would not be waived because the trial court was given an opportunity to rule on this before the verdict of the jury was returned.

It is apparent, from an analysis of the numerous cases which have reached this Court and have been reversed because insurance was mentioned, that the procedural method of raising this point of error is relatively unimportant so long as it is in some way brought to the attention of the trial court to support a contention in the appellate court that the mention of indemnity insurance was of such prejudicial nature that the defendant below could not have secured a fair trial from that point on. This is clearly illustrated in point 1, syllabus, *Wilkins v. Schwartz,* 101 W. Va. 337, 132 S. E. 887, wherein it is stated: ''The jury should not in any manner be apprised of the fact that the defendant is protected by indemnity insurance, and such action on the part of plaintiff or his counsel will ordinarily constitute reversible error, nothwithstanding the court may instruct the jury not to consider the same in arriving at a verdict.'' See *Atkins v. Bartlett,* 101 W. Va. 263, 132 S. E. 885; *Fleming v. Hartrick,* 105 W. Va. 135, 141 S. E. 628.

It is also contended that this matter was waived because the motion for a mistrial was not made immediately after insurance was mentioned by the witness. If the motion had been made immediately before the jury, it would have unduly called the attention of the jury to the improper matter, and as indicated herein, the motion was made outside the hearing of the jury in the judge's chambers soon after it was brought out in the case. The motion was timely made,

under the facts and circumstances in this case. See *Flanagan v. Mott, supra.* As indicated herein, the trial court should have sustained the defendants' motion for a mistrial and the failure to do so constitutes reversible error.

The judgment of the Circuit Court of Kanawha County is reversed, the judgment of the Common Pleas Court of Kanawha County is reversed, the verdict of the jury is set aside and a new trial is awarded to the defendants.

*Judgments reversed;*
*verdict set aside;*
*new trial awarded.*

BROWNING, JUDGE, dissenting:

I dissent. Upon the sole ground that the jury was "improperly apprised" of the fact that the defendant was protected by indemnity insurance was the judgment of the Circuit Court of Kanawha County reversed.

It is obvious from the testimony of the only two medical witnesses who testified in this case, Drs. Anderson and Kuhn, both eminent orthopedic surgeons of the City of Charleston, that the verdict of the jury was not excessive. The evidence is uncontroverted as to liability. The plaintiff travelling toward his home on a highway slick with ice and snow, and, using chains, was proceeding at a cautious rate of speed and in his proper lane of traffic when the defendant, without chains, ran around one automobile to the rear of plaintiff and attempted to pass the plaintiff's automobile when he observed a car coming in the opposite direction, attempted to get back into his proper lane, was unable to control his car and crashed into the rear of plaintiff's vehicle.

In *Moorefield Administrator v. Lewis*, 96 W. Va. 112, 123 S. E. 564, this Court refused to disturb a judgment for the plaintiff upon the verdict of a jury when the record showed that, in his opening statement

to the jury, counsel for the plaintiff said: "I might say that the defendant, Mr. Lewis, has insurance." The Court said: "The trial court should have sustained the motion to discharge the jury because of counsel's effort to inject into the trial a matter so plainly erroneous and highly prejudicial to defendant; and we would be inclined to reverse the case on this ground, but for the fact that, in our opinion, a plain case for recovery has been established by the whole evidence. * * *" The language in the 9th Syllabus Point in the instant case, which is a quotation of the 1st Syllabus Point of *Wilkins v. Schwartz,* 101 W. Va. 337, 132 S. E. 887, has the qualification that the apprisal of the jury of the fact that the defendant was protected by indemnity insurance "will *ordinarily* constitute reversible error." (Italics Supplied.) A review of the decisions of this Court, and of other courts, shows clearly that the language of the syllabus, to the effect that the jury should "not in any manner be apprised of the fact that the defendant is protected by indemnity insurance.", is not entirely accurate.

In *Butcher v. Stull,* 140 W. Va. 31, 82 S. E. 2d. 278, this Court held that it was not error, reversible or any other kind of error, for counsel for a plaintiff, in a personal injury action arising out of an automobile collision, to ask a witness for the defendant, upon cross-examination, if he were not an adjuster for the company which carried insurance on the defendant's automobile. It is true that the Court stated in the opinion that the jury should be informed that such information was elicited solely to show the interest or bias of the witness, but the jury was "apprised of the fact that the defendant" was "protected by indemnity insurance". In the *Stull* case, this Court said: "This Court is firmly committed to the rule that a plaintiff in a personal injury or wrongful death case may not, for the reasons ably stated in the cases heretofore cited in this opinion, improperly inform the jury of the fact that the defendant is protected by indemnity insurance. Thus, a shield has been provided for the protection of insurance companies. However, this

shield must not be converted into an offensive weapon to be used for a purpose not contemplated by the rule. The unpleasant situation in which this insurance company found itself was not created by the plaintiff, her counsel, or witnesses.* * *''

The majority, as revealed by the Court's opinion, would absolve counsel for the defendant of all blame for the injection of insurance into this case by this statement: ''Notwithstanding the facts that the statement had never been introduced into evidence, had not been used in cross-examination up until this time, and the witness had not been impeached by the questions propounded to him, the first question asked by the attorney for the plaintiff on redirect examination follows: * * *.'' If counsel for the defendant were not using this statement for the purpose of laying the foundation for impeaching the witness, the Court in its opinion gives no explanation as to why he should have been allowed to use it. The only other purpose in using it it seems would be to goad the witness or counsel for plaintiff into making a statement relating to insurance so as to inject reversible error into the record. It must be remembered that counsel for the defendant was the only person in the courtroom, with the possible exception of the witness Jarrell, who was being cross-examined, who knew exactly what was contained in that statement. Counsel for the defendant knew well whether the answers made eight months previously were in conflict with the evidence by the witness on direct examination. Furthermore, counsel for the defendant referred to the person who took this statement as being ''an employee'' of his. Certainly, the judge and counsel for the plaintiff, as well as the jurors, knew that counsel for the defendant did not own an insurance company and if that person were an employee of his, an investigator, or an attorney associated with him in the practice of the law, then he would not have been an adjuster or other official of an insurance company. There was no objection to counsel for the plaintiff's question: ''Homer, do you

know who this man was you made the statement to? Do you know who he was?" The courts of twenty jurisdictions, including West Virginia, are cited in 4 A.L.R. 2d 784, for this statement: "By weight of authority, if counsel propounds a question which calls for proper evidence, the fact that an irresponsive or inadvertent answer includes a reference to insurance will not be ground for declaring a mistrial." The West Virginia case cited is *Smith v. Gould*, 110 W. Va. 579, 159 S. E. 53; 92 A.L.R. 28. This is the 2nd Syllabus Point of that case, citing *Ambrose v. Young*, 100 W. Va. 452, 130 S. E. 810: "Testimony volunteered by a witness in a damage action against an automobilist for personal injuries, to the effect that the defendant was protected by indemnity insurance, is not reversible error where it clearly appears that counsel for the plaintiff did not solicit such testimony and could not have anticipated the objectionable answer of the witness, and where the court instructed the jury to disregard it." Judge Maxwell also stated in the opinion: "And again, a case will not be reversed on that ground, 'if the verdict for the plaintiff is supported by a plain preponderance of the evidence.' *Jeffries v. Ashcraft*, 104 W. Va. 636. That, too, is the situation at bar."

In *Gorton v. Doty*, 57 Idaho 792, 69 P. 2d 136, it was held that where conduct of counsel for the defendant was such as to provoke a remark by plaintiff's counsel with respect to insurance, such reference to insurance will not be ground for granting a mistrial. For other authority to the same effect see: 4 A.L.R. 2d 820, under the title: "Estoppel to Claim Prejudice; Delay in Making Objection", and 4 A.L.R. 2d 783, under this heading: "Defendant Opening Door to Reception of Testimony."

Perhaps the decision of the Court, and the position of this dissenting Judge, could better be understood by some verbatim quotations from the record. After Mr. Palmer, counsel for the defendant, had been cross-examining the plaintiff's witness Jarrell for some time, this appears in the record:

"\* \* \*.

"Mr. DiTrapano: Your Honor, Mr. Palmer sent an attorney or some agent up to talk to this man and he made a statement to him and he has the statement here in his hand and to impeach the witness he should ask him the proper questions and he should ask him what statement was made and should read his statement to him because it isn't fair to come in here and introduce the statement here after he has questioned him. I understand he is trying to impeach the man.

"The Court: If he seeks to use the statement and if there is an objection, of course, that may come later.

"Mr. Palmer: I can't hear.

"The Court: I think you may proceed with your cross examination so long as it is proper cross examination and if there is any attempt to use the statement and if there is any objection to that, it may come later.

"Mr. Palmer: That will come up if I make an improper question and if I don't make an improper question then I move the remarks of counsel be stricken from the record since I have asked no question which would call for them.

"The Court: Let's get along with the cross examination."

Thereafter, counsel for the defendant asked and received answers to approximately fifty questions in cross-examination of this witness, when the following questions, answers, colloquy, objections and rulings by the court occurred:

"\* \* \*.

"Q: And one other thing, did an employee of mine come to see you on September 29th to help investigate the case?

"A: Yes, sir.

"Q: And I want to ask you if you told him certain things. Did you tell him that the roads were icy and slick?

"A: Yes, sir, they were bad.

"Q: My question is—

"A: (Interrupting) I don't know whether I said icy or slick and covered with snow but it was bad.

"Q: Let me finish my question. My question is, did you tell this gentleman who came to see you that the roads were icy and slick? Just answer that, yes, or no.

"Mr. DiTrapano: This is impeachment and I think he should ask the witness whether or not he wrote this down and let me see this (indicating).

"Mr. Palmer: No.

"Mr. DiTrapano: You will not let me see this?

"Mr. Palmer: No.

"Mr. DiTrapano: I think he should ask the witness if the statement wasn't made on this date.

"The Court: Well, I think you have a right to go into that.

"Mr. DiTrapano: I want to see all of that.

"The Court: You may answer the question.

"Mr. Palmer: Do you have the question in mind?

"A: Yes, sir, I have the question in mind. If I said it was icy or slick.

"Q: Did you tell the man the roads were icy and slick?

"The Court: If you know, you may say so.

"The Witness: I don't know whether I told him it was icy and slick.

"Mr. Palmer: Q. Would you deny you told him they were icy and slick?

"Mr. DiTrapano: I object, unless he identifies the statement and lets the witness read it. That is the way to impeach and not to go on a fishing trip and let him catch him up in the statement made to an employee or an employee of the defendant. That is not proper. That is no great victory, to confuse a witness on a statement made a few weeks ago.

"Mr. Palmer: I object to the remarks of counsel.

"Mr. DiTrapano: I will withdraw that statement and apologize.

"The Court: All right. I think he has answered that question.

"Mr. Palmer: He hasn't answered whether he denies he made it. He said he doesn't recall it and my question is, does he deny it?

"The Witness: I made the statement that the roads were bad and I don't know whether I said they were slick and had ice on them or snow but the roads were bad.

"Mr. Palmer: That is sufficient.

"The Court: Of course, that is admitted on the part of everybody.

"Mr. DiTrapano: There is no question about that.

"The Court: And I don't know how material it is going to be.

"Mr. Palmer: The condition of the roads is very material, your Honor.

"The Court: If there was any conflict, of course, it would be material.

"Mr. Palmer: We don't know what the other witnesses will say, but we have to get from this witness his version.

"The Court: You may proceed.

"Mr. Palmer: Q. Did you tell this gentleman, 'Morris had slowed down to about five miles an hour to come to a halt when we were struck in the rear'?

"A: Read that again.

"Q: 'Morris had slowed down to about five miles an hour to come to a halt when we were struck in the rear.'

"A: That is the same question as a while ago, whether I made it or not?

"Q: My question is at this time, did you tell this gentleman that? That is the whole question. Did you tell this gentleman that or not?

"A: I don't remember whether I said five miles an hour or not.

"Q: My question is whether or not you told this gentleman these exact words. Will you try to remember whether you did or didn't. 'Morris had slowed down to about five miles an hour to come to a halt when we were struck in the rear.'

"Mr. DiTrapano: I don't mean to unduly object but I think when you introduce a statement into evidence or attempt to impeach the witness, the witness should be given the opportunity to examine the statement to see if that is the statement he signed and we don't know what he has got there.

"Mr. Palmer: I didn't say anything about the statement. I asked him if he told this man these words.

"The Court: I believe he has the right to ask him if he told someone those words.

"The Witness: I don't know whether I told him those words or not.

"The Court: And I think he has a right to do that.

"Mr. Palmer: I beg your pardon. You may answer the question.

"A: I don't know if that is the exact words or not; and he had slowed down probably to five miles an hour.

"Q: My question is, did you tell him those words or substantially those words that 'Morris had slowed down to about five miles an hour to come to a halt when we were struck in the rear.' If you don't remember the exact words, was that substantially what you told him?

"A: Yes, sir, something in that nature. Yes, sir.

"Mr. DiTrapano: May I see the statement, please?

"Mr. Palmer: No. That is all.

### "REDIRECT EXAMINATION

"By Mr. DiTrapano:

"Q: Homer, do you know who this man was you made that statement to? Do you know who he was?

"A: He was the insurance man. I don't know what he does, probably an investigator.

"Q: Did he write this down or did you write it yourself?

"A: He wrote it down. He asked me the questions and he done the writing and I don't know whether I said five miles an hour.

"Q: Did you sign the statement?

"A: Yes, sir.

"Q: Did you read it?

"A: No.

"Q: You presumed he was putting down what you said?

"A: Yes, sir.

"Q: And you cooperated with him fully and answered the questions as best you could?

"A: I answered the questions as nice as I could.

"Q: How long after this accident did it happen, the questioning that is?

"A: About eight months before the insurance man came to me asking me the questions.

"Q: About eight months after the accident?

"A: About eight months, that's right?

"Q: Homer, did you have any notion or were you sensible at the time of the collision that the Wesco Corporation's station wagon was going to pass you?

"A: I did not, no.

"Q: Did you hear a horn sounded?

"A: I didn't hear a horn.

"Q: Homer, I have just one more question, and you have marked on these photographs?

"A: Yes, sir, I marked them and I marked about where the accident happened and I did not mark the spot in the road where it happened.

"Q: Is this an estimate to the best of your ability?

"A: That is to the best of my ability. I will say that is about right where it happened.

"Mr. DiTrapano: That is all.

"Mr. Palmer: If your Honor please, since the witness has agreed that he said substantially what I have read and the two parts of the statement he said are correct, I would not be entitled to impeach him and if the witness and counsel wish to see and read

the statement, I have no objection at all because I don't want anyone to get the impression there is anything to hide in it and I asked the witness about the two particular matters and he agreed in substance that is what he said and there is no impeachment when the witness agrees with it and, therefore, if counsel and the witness would like to see it, I have no objection.

"The Court: He said in substance that is what he testified to originally and actually that is the reason the Court mentioned a moment ago it didn't see the point in cross examination and there was no conflict.

"Mr. Palmer: If the witness agrees with it there can be no impeachment and, therefore, the statement cannot be used and I don't want to give the impression that there is anything I want to hide from counsel and if counsel or the witness wants to see it, they may.

"Mr. DiTrapano: I just wanted him to give me the statement to see if that is the one he signed and now I don't want to see it.

"RECROSS EXAMINATION

"By Mr. Palmer:

"Q: I will ask Mr. Leftwich to look at his signature. Is that your signature, Mr. Leftwich?

"Mr. DiTrapano: Mr. Jarrell.

"Mr. Palmer: Excuse me. Mr. Jarrell, is that your signature?

"A: Yes, sir, that is my signature. I just wondered if it was down here at something after that.

"Q: You may look at it if you wish.

"A: All right. There isn't anything.

"The Court: Well, since you are just letting him see it out of curiosity, I don't thing it is necessary. Are there any further questions?

"Mr. Palmer: Q. Was there anything put in that you hadn't knownabout?

"A: I didn't read it all but I think it is fair.

"Q: Is it fair and the way you said it?

"A: Yes, sir.

"Mr. Palmer: That is all. I wanted to get that point cleared up.

"The Court: Anything further?

"Mr. Palmer: No, sir, not at this time.

"The Court: You may stand aside.

"(Whereupon the witness was then excused.)

"Mr. Palmer: If your Honor please, may we see the Court.

"(Whereupon the Court and counsel for the respective parties retired to the Court's chambers and the following proceedings were had out of the presence and hearing of the jury:)

"Mr. Palmer: Your Honor, regretfully we have to move the Court for a mistrial because of the fact that while asking the witness questions as to what he had told a person and not what was in the statement, and I didn't use the word, statement, at all at any time and Mr. DiTrapano before I asked him a question made certain motions to the Court about a statement or paper which I had in my hand which the Court overruled and I then very carefully asked the witness if he had told a person certain things which the witness apparently agreed or in substance agreed. Thereafter Mr. DiTrapano of his own witness asked who the person was to whom he made the statement and the statement was not in evidence and was not introduced into evidence and there was no need to because the witness having agreed with it there was no impeachment and the witness then brought out directly and positively about insurance which causes me regretfully to make the motion for a mistrial."

I would affirm the judgement of the Circuit Court of Kanawha County of June 2, 1960, in refusing to disturb the judgement of the Court of Common Pleas, entered upon the jury verdict for the plantiff in the sum of $10,000.00, which judgment is dated February 8, 1960.